UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 24-cr-15 (NEB/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| Ikram Yusuf Mohamed, et al., | |
| Defendants. | |

### INTRODUCTION

In this Feeding Our Future case, the Government alleges seven defendants falsely claimed reimbursement for meals never served, then laundered the fraudulently obtained proceeds. This Order resolves Defendants' joint motion for a change of venue to the Northern District of Illinois. For the reasons stated below, Defendants' motion is denied.

### ANALYSIS[1]

**I.   Change of Venue**

Defendants move for a change of venue under Federal Rule of Criminal Procedure 21(a). Dkt. No. 204. "The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). "By constitutional design, that trial occurs 'in the State where the . . . Crimes . . . have been committed.'" *Id.* at 377–78 (quoting Art. III, § 2, cl. 3). Due process nonetheless requires that venue be transferred if "extraordinary local prejudice will prevent a fair trial." *Id.* at

---

[1] A concurrently issued order addressing seven nondispositive pretrial motions contains a summary of the Superseding Indictment. *See* Dkt. No. 258. That summary provides helpful background information regarding this case and the alleged fraud scheme.

378. Rule 21(a) outlines the applicable transfer-of-venue procedure: "Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

When reviewing "whether pretrial publicity violates a criminal defendant's right to a trial by a panel of impartial and indifferent jurors," the Eighth Circuit Court of Appeals engages in a two-tiered analysis. *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).[2] Tier one is whether "pretrial publicity was so extensive and corrupting that a reviewing court is required to 'presume unfairness of constitutional magnitude.'" *United States v. Blom*, 242 F.3d 799, 803 (8th Cir. 2001) (quoting *Pruett v. Norris,* 153 F.3d 579, 585 (8th Cir. 1998)). This "presumption of inherent prejudice is reserved for rare and extreme cases." *Id.* "[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quoting *Neb. Press Assn. v. Stuart,* 427 U.S. 539, 554 (1976)). Tier two is whether "the voir dire testimony of those who became trial jurors demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." *Blom*, 242 F.3d at 803. Only tier one is at issue here.

Defendants argue that "[t]he only way to ensure the moving defendants can have a fair trial is to transfer venue to a multi-ethnic district like the Northern District of Illinois."

---

[2] District courts apply the same analysis. *United States v. Johnson*, 354 F. Supp. 2d 939, 981 (N.D. Iowa 2005) (rejecting the argument that the two-tiered analysis is only appropriate for appellate review); *see also United States v. Mentzos*, No. 04-cr-173, 2005 WL 8165166, at *5–7 (D. Minn. June 9, 2005), *aff'd by* 2005 WL 8165168 (D. Minn. July 13, 2005).

Dkt. No. 205 at 2. Defendants start by contending that the Feeding Our Future fraud scheme has been subject to "unrelenting negative publicity." Dkt. No. 205 at 4. According to Defendants, "[d]efendant after defendant has been convicted by way of guilty plea or trial, and in one case a defendant was charged with bribing jurors following his trial. With each case, the jury pool continues to be tainted, as, with every passing day, the reputation of the Somali community gets tarnished in local media[.]" *Id.* For support, Defendants offer several articles covering the Feeding Our Future fraud scheme published in 2025. *Id.* at 5. Even accepting that Feeding Our Future has been the subject of widespread, negative, pretrial publicity, this is not enough to grant Defendants' motion.

"Because our democracy tolerates, even encourages, extensive media coverage of crimes such as murder and kidnapping, the presumption of inherent prejudice is reserved for rare and extreme cases." *Blom*, 242 F.3d at 803. For that reason, media coverage must be particularly extreme to create an inherent presumption of prejudice. For example, the Supreme Court reasoned that a "dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it." *Skilling*, 561 U.S. at 382. In other cases, the Court has overturned convictions "utterly corrupted by press coverage," such as when a "carnival atmosphere" pervaded the trial. *Id.* at 380–81. High profile, pervasive, adverse publicity in cases such as the Enron accounting fraud, Petters fraud scheme, and Boston Marathon bombing was found insufficient to require a change of venue. *Skilling*, 561 U.S. at 377–85; *Petters*, 663 F.3d at 385–86; *In re Tsarnaev*, 780 F.3d 14, 20–24 (1st Cir. 2015) (per curiam). The Court is not persuaded that Feeding Our Future's pretrial publicity is of a fundamentally different character than *Skilling*, *Petters*, or *Tsarnaev*. None of the media publicity surrounding Feeding Our Future comes close

3

to, for example, a dramatically staged admission of guilt. *See Rideau v. Louisiana*, 373 U.S. 723, 725 (1963). Nor is it possible to conclude that a "carnival atmosphere" has pervaded a trial that that has yet to occur.

Three further considerations undermine Defendants' concerns of negative pretrial publicity. First, is the size of the jury pool. A large jury pool weighs against a presumption of prejudice. *See Skilling*, 561 U.S. at 382. In *Skilling*, more than 4.5 million individuals were eligible for jury duty in the Houston area. *Id.* The Court reasoned that "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* The Court applied the same reasoning when a jury venire was drawn from a population in excess of 600,000. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1991). The same rationale follows here; the diverse population base from which the jury will be drawn is roughly 4.2 million people.[3] The Eighth Circuit has already explained how this large jury pool disfavors a presumption of prejudice. *Petters*, 663 F.3d at 385. Defendants do not cite, and this Court's research has not uncovered, any case in which a court has found that pretrial publicity created a presumption of prejudice in such a large jury pool.

Second, there is no evidence that a presumption of guilt pervaded the first Feeding Our Future trial. As the Supreme Court found relevant in *Skilling*, "earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government." *Skilling*, 561

---

[3] The jury for this case will be drawn from the third and fourth divisions, which encompass the Twin Cities and southern Minnesota. According to 2020 census data, those two divisions have a combined population of 4,233,710. *2020 Census Citizen Population Tables*, JNET, https://jnet.ao.dcn/court-services/district-clerks-offices/jury-management/juror-usage-and-statistics/census-2020-citizen-population-tables (click "Minnesota (MN)") (last visited Jan. 30, 2026).

4

U.S. at 383. The same logic applies here. Two defendants in the first Feeding Our Future trial were acquitted. Other defendants were convicted on some counts but acquitted on others. The jury's careful count-by-count verdict in the first Feeding Our Future trial strongly undermines Defendants' concern that the jury pool has been pervasively prejudiced by negative media coverage. To the contrary, it shows that any potential for prejudice can be properly cured through careful voir dire and jury instructions.

Defendants counter that subsequent events—including dozens of guilty pleas, a jury bribery scheme, and a second trial, along with the associated media coverage—undermine the relevance of the first Feeding Our Future trial to this analysis. *See* Dkt. No. 205 at 1–2. According to Defendants, this ongoing media coverage has resulted in a cumulative prejudicial impact. The Court is not convinced. To start, the passage of time ordinarily reduces concerns of prejudice. *Skilling*, 561 U.S. at 383; *see also United States v. Nelson*, 347 F.3d 701, 709 (8th Cir. 2003) ("Generally, we have concluded that there should be no presumption of inherent unfairness where there has been a substantial delay between the criminal act and the trial."); *United States v. Allee*, 299 F.3d 996, 1000 (8th Cir. 2002) (passage of one year minimized concerns of prejudice); *United States v. Green*, 983 F.2d 100, 103 (8th Cir. 1992) (passage of two years minimized concerns of prejudice). Defendants offer no case where a court reasoned that the passage of time resulted in a greater, cumulative, prejudicial impact. *See generally* Dkt. No. 204. Nor do Defendants offer public opinion data to support their supposition. True, the large number of defendants charged in the Feeding Our Future fraud scheme has resulted in recurrent news coverage as the media covers the activity in the different cases. But even accepting that the passage of time has not necessarily reduced the intensity of Feeding Our Future

5

media coverage, it does not necessarily follow that on-going media coverage has resulted in a *cumulative* prejudicial impact. Moreover, the second Feeding Our Future trial, a 2025 trial with higher profile defendants than the seven defendants charged in this case, does not support Defendants' argument. Jury questionnaires revealed that plenty of prospective jurors remained unfamiliar with the Feeding Our Future fraud scheme.[4] And although careful voir dire and jury instructions were necessary, the Court was able to impanel an impartial jury.

Third, courts distinguish between media attention directed at an individual and publicity directed at a fraud scheme or event generally. *Skilling*, 561 U.S. at 384 n.17. "[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." *Id.* (quoting *United States v. Hueftle,* 687 F.2d 1305, 1310 (10th Cir. 1982)) (alteration in original). The articles identified by Defendants relate to the Feeding Our Future fraud scheme generally or other specific defendants. No doubt there is some media coverage related to the seven defendants charged here, but it is only a small portion of the overall fraud-scheme coverage. In short, even if prospective jurors are aware of Feeding Our Future generally, it does not necessarily mean they will be unable to remain impartial in the trial of *these* defendants.

Beyond the specific Feeding Our Future coverage, Defendants also contend that "this is an extraordinary case marked by an unprecedented confluence of: inflammatory media coverage; executive branch interference and rhetoric; overt ethnic and religious stereotyping; militarized federal enforcement; and saturation of the jury pool with

---

[4] Not that ignorance is required to be an impartial juror. *Skilling*, 561 U.S. at 381 ("[J]uror *impartiality,* we have reiterated, does not require *ignorance*.").

6

prejudicial information." Dkt. No. 242 at 2. For support, Defendants point to dozens of public remarks, press releases, and social media posts from the administration and legislators related to fraud in Minnesota and Somali immigrants. *Id.* at 6–8; *see also* Dkt. No. 242-1.

The Court must be blunt: it shares Defendants' concerns. This administration's rhetoric toward Somali immigrants is deeply troubling. That rhetoric has included calling Somalis garbage, pirates, supporters of terrorism, criminals, and fraudsters. Isabella Murray et al., *Trump describes Somali immigrants as 'garbage' amid feud with Minnesota congresswoman, governor*, ABC News (Dec. 3, 2025) https://perma.cc/R4CH-PR6T, Jesse Watters Primetime, *Stephen Miller: We shouldn't be shocked by Minnesota fraud case considering Somalia's primary occupation is 'pirate'*, Fox News (Dec. 19, 2025) https://perma.cc/V9EK-YRW7; Dkt. No. 242 at 6–7 (citing statements by Representative Tom Emmer and Treasury Secretary Scott Bessent); Dkt. No. 242-1 at 9; *e.g.*, Dkt. No. 205 at 14 (embedding a social media post from Press Secretary Karoline Leavitt). Such reckless and inflammatory rhetoric, though par for the course in this administration, undoubtedly makes this Court's job—the impartial administration of justice—more difficult.

Nonetheless, the Court is not persuaded that this rhetoric is so prejudicial that Defendants will be unable to obtain a fair and impartial trial in Minnesota. True, the statements identified by Defendants have no doubt influenced some Minnesotans, especially those who are supporters of the administration. Perhaps some prospective jurors have been sufficiently influenced that they would be unable to impartially sit on the jury for the trial of any Somali defendant (including the seven defendants charged here).

But the rhetoric Defendants cite is partisan. State and local democrats have pushed back against the administration's narrative, Jeff Wald, *Minneapolis Mayor Jacob Frey: 'Damn right I'll stick up for Somalis,'* Fox 9 (Dec. 9, 2025) https://perma.cc/5SCY-YP4Q; Steve Karnowski, *Gov. Walz denounces Trump for calling Minnesota's Somali community 'garbage'*, U.S. News (Dec. 4, 2025) https://perma.cc/6KXA-QR3A, and plenty of Minnesotans dislike President Trump. After all, a plurality of Minnesotans voted against him in three successive presidential elections. There is little reason to believe prospective jurors who already dislike the president and oppose his policies will be swayed much (if at all) by the administration's toxic, partisan rhetoric. Indeed, it may well be that Minnesota may be a more impartial venue than others. Jurors drawn from the Twin Cities metro area, where the Somali population is densest, may well ignore the administration's race-baiting, xenophobic rhetoric that paints all Somali immigrants as "garbage" precisely because such statements conflict with the jurors' own experiences of their Somali neighbors, leaving them to judge the individual defendants' guilt or innocence based solely on the evidence introduced at trial.

Defendants counter that "when the nation's highest executive authority publicly denounces an accused or signals a desired outcome, the resulting prejudice can be both overwhelming and irreparable. Military law treats such conduct as uniquely corrosive because public statements by the Commander in Chief or senior leaders can exert subtle but powerful pressure on fact-finders and decisionmakers[.]" Dkt. No. 242 at 8. Defendants claim that these principles of military law are "directly analogous here." *Id.* at 9. Not so. The military justice system, unlike the federal judiciary, is uniquely sensitive to unlawful command influence. "Striking a compromise between those who

8

wanted to retain absolute command control of courts-martial and those who advocated eliminating it altogether, Congress preserved command control over the court-martial processes but provided restrictions to eradicate misuse of command power." Walter Huffman and Richard Rosen, *Military Law: Criminal Justice & Administrative Process § 7.3* (Sept. 2022 update). Simply put, the influence of military commanders, including the president as Commander in Chief, over the armed forces and the quasi-judicial court-martial process is quite different from the president's influence over a co-equal, independent, federal judiciary and the citizen jurors it empanels for trials.

Defendants also argue that prospective jurors "would have a personal interest in the outcome of [this] trial" because "[e]very one of them would know that the President wants a conviction and that a failure to deliver one could result in more ICE agents or CBP officers being sent to Minnesota, or more punitive financial actions taken against the residents of Minnesota, citizens and noncitizen alike." Dkt. No. 254 at 4–5. According to Defendants, "common sense dictates that there are some in the jury pool who blame the Somali community generally, and the defendants particularly, for the presence of ICE and CBP agents in Minneapolis and for the cuts in public funding." *Id.* at 5. Stated otherwise, Defendants contend jurors will convict them to avoid fear of retaliation from the administration or because those jurors will blame them for the administration's actions targeting Minnesota. The Court is not convinced.

Minnesotans have fiercely protested and resisted Operation Metro Surge.[5] *See, e.g.*, Tim Sullivan, *A shadow network in Minneapolis defies ICE and protects immigrants*,

---

[5] Operation Metro Surge is a large-scale immigration enforcement operation launched in the Twin Cities by the United States Department of Homeland Security in December

9

U.S. News (Jan. 29, 2026) https://perma.cc/WGB4-N2LS; Eric Roper, *How Minnesota's civic culture fueled a tough ICE resistance, took feds by surprise*, The Minnesota Star Tribune (Jan. 29, 2026) https://www.startribune.com/minnesota-minneapolis-ice-resistance/601571139. Just last week, tens of thousands of Minnesotans marched past the Minneapolis federal courthouse in sub-zero temperatures to protest the presence and conduct of federal law enforcement in Minnesota. It suffices to say the Court is skeptical that Minnesotan jurors will bend over backwards to appease the administration so as to avoid retaliation. Moreover, the Court has ways to safeguard the identity of the jurors who are ultimately empaneled in this case. The trial is months away. Whether and to what extent the administration will focus on the upcoming trial in this case is unclear. Although the prospect of retaliation for an unfavorable verdict is (unfortunately) not entirely implausible, it remains speculative at this time.

To be clear, Defendants' arguments are far from frivolous. Defendants, the Government, and this Court are all inferring—based on limited data—how pretrial publicity, executive-branch statements, and Operation Metro Surge will impact the impartiality of prospective jurors. The parties and District Judge Brasel will be in a better position to evaluate concerns of prejudice after receiving jury questionnaires and conducting voir dire. *See United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986) (noting the benefits of voir dire to assessing the effects of pretrial publicity); *United States v. Sabhnani*, 599 F.3d 215, 234 (2d Cir. 2010) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire.") (quoting source omitted).

---

2025. The operation has involved the presence of thousands of federal law enforcement agents in the Twin Cities.

Evolving circumstances could also impact whether the Court believes it will be able to impanel an impartial jury. Therefore, the Court denies Defendants' motion without prejudice.[6]

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED**: Defendants' Motion for Transfer of Trial on Behalf of All Defendants (Dkt. No. 204) is **DENIED** without prejudice.

Dated: February 2, 2026

      s/ David T. Schultz
DAVID T. SCHULTZ
United States Magistrate Judge

---

[6] Discretion allows more than due process requires. However, for the same reasons that due process does not require a change in venue, the Court is not persuaded that Defendants cannot obtain a fair and impartial trial in Minnesota.